IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

CHUMEICA PADEN, )
)
Plaintiff, )
)
v. )
) Case No. 17-CV-621-TCK-JFJ
O'REILLY AUTOMOTIVE STORES, INC. )
)
Defendant.. )

## OPINION AND ORDER

Before the Court is the Motion for Summary Judgment (Doc. 24) filed by Defendant O'Reilly Automotive Stores, Inc. ("O'Reilly"). O'Reilly seeks summary judgment against Plaintiff Chumeica Paden on Ms. Paden's claims against it for sexual harassment, retaliation and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964 and 1991, as amended, 42 U.S.C. §§ 2000e, *et seq.*

**I. Material Facts**

On March 6, 2015, Plaintiff was hired by O'Reilly as a parts delivery driver for Store 169 located at 309 E. Main Street, Henryetta, Oklahoma. (Doc. 24, Ex. 1, Pl. Employment Summary). At the time of her hire, Plaintiff lived at 301 W. 6th Street in Dewar, Oklahoma. *Id.* O'Reilly operates another Store (Store No. 189) in Okmulgee County, located at 220 S. Wood Dr., Okmulgee, Oklahoma. *Id.* The distance between Plaintiff's residence and Store 189 in Okmulgee is 12.7 miles, resulting in a 16-minute commute. (Def. Ex. 2, Map).[1] The distance between Plaintiff's residence and Store 169 in Henryetta is 3.4 miles and a six-minute commute. *Id.*

---

[1] Plaintiff asserts the distance between her residence and the Okmulgee store is 14.3 miles and a 20 minute commute. (Doc. 34, Resp. to Def.'s SOF 4). However, the map she relies

Plaintiff testified that while employed by O'Reilly, she was scheduled to work three days a week from 9 a.m. to 3 p.m., for a total of 18 hours, and that she took any other hours O'Reilly would provide. *Id.*, Ex. 4, Pl.'s Dep., 29:38; 30:22-24. She stated that on average, she worked an additional two hours a day, twice a week, when asked. *Id.*, at 29:3-5; 30:22-24. However, Plaintiff's payroll records show that her work hours varied, with no 18-hour guarantee. Doc. 39, Ex. 6. In the five months before her resignation, she worked between approximately 11 hours to 24 hours a week. *Id.*

Plaintiff has three children, who were ages ten, eight and four during her employment with O'Reilly. Ex. 4 at 69:18-71:29. The two oldest were in Dewar Public Schools and the youngest was in early development child care. *Id.* During the school year, the two oldest children were in school from 8:15 a.m. to 3:30 p.m. *Id.*, at 70:20-71:18. In the summer months, the two oldest children stayed with grandparents. *Id.*, at 71:20-22. Plaintiff's mother watched the youngest child during the summer months, if needed. *Id.*, at 72:1-12. On the days Plaintiff worked additional hours beyond her scheduled hours, her children stayed with friends. *Id.*, at 58:19-59-6. Plaintiff testified that "obviously, staying with friends can't happen every day" if she was working. *Id.*, at 59:4-6.

Plaintiff alleges that in March 2015, she and co-worker Vicky VanMeter delivered parts to O'Reilly customer Greg Henry, of Greg Henry's Auto & Boat Repair. Doc. 5, First Amended Complaint, ¶12. She contends that after Ms. VanMeter introduced Plaintiff, Mr. Henry stated, "I can handle seeing that every day." *Id.* Plaintiff alleges that Mr. Henry continued making similar

---

on in support of this assertion is for a residence located at 301 *S. 6th* Street in Dewar. (emphasis added). Doc. 34, Exs. 1, 2. In any event, this dispute is immaterial. *See Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998) (holding that a lateral transfer which increased plaintiff's travel time from five to seven minutes to thirty to forty minutes was not an "adverse employment action").

comments throughout her employment. *Id.* In June of 2015, he started asking Plaintiff inappropriate questions, including "Does your husband please you?" and "Are you being satisfied at home? Because I'm sure I can do a better job," and that he would tell her that she forgot something, only to tell her when she walked back to him that he 'just wanted to watch [me] walk away again.'" Doc. 34, Ex. 4, Paden Affid. Plaintiff alleges that in November of 2015, Plaintiff made three deliveries to Mr. Henry's shop within a span of a few hours, and that Mr. Henry made sexually inappropriate comments to her, even though she asked him to stop. Doc. 5, ¶14.

Plaintiff testified that in November of 2015, she told Store Manager Brayden Hackler that Mr. Henry had "ma[d]e comments daily" to her when she made deliveries to his business; however, she never told him that she was uncomfortable making deliveries there or that somebody else needed to take over the driving responsibilities. Doc. 24, Ex. 4 at 26:8-27:6; 33:20-34:3.

Plaintiff also testified that in December of 2015, Mr. Henry visited the Henryetta store and made inappropriate comments to her, including that she looked sexy and that he would leave parts there so she could bring them to him later. Doc. 5, Complaint, ¶18; Doc. 34, Ex. 3, Paden Dep., 20:25-21:6.

In response to an interrogatory asking her to state "each date on which you notified O'Reilly of the alleged discrimination that is the subject of this litigation," Plaintiff stated:

> On February 2, 2016, Plaintiff informed Mary Messer, Assistant Manager[,] of the sexual harassment. On February 2, 2016, Plaintiff informed Brayden Hackler, Store Manager, of the sexual harassment. They spoke again on February 3rd. On February 9, 2016, Plaintiff informed Scott Mullin, District Manager of the sexual harassment.

Doc. 24, Ex. 5, Response to Interrogatory No. 8.

Shawn Howell, O'Reilly's Installer Service Specialist, was responsible for drivers and deliveries. Doc. 34, Ex. 5, Shawn Howell Dep. at 5:16-20, 7:1-8. Plaintiff testified that she told Mr. Howell that Greg Henry "ma[de] comments daily that aren't needed." Doc. 24, Ex. 4, Paden Dep. at 21:14-21. She admitted she did not tell him she didn't want to make deliveries to his business, although she did tell him "if it was preventable while other drivers were there, I would prefer not to." *Id.*, 22:2-8. However, she said that it "never worked out" in her favor because she "was, basically, the only [delivery person] for most of the day." *Id.*, 22:10-11.[2]

Plaintiff testified that a former O'Reilly employee, Tammy Collins, told her Mr. Henry had also made inappropriate comments to her when she made deliveries to his business. *Id.*, 22:23-23:24. However, Ms. Collins testified that although Greg Henry had sexually harassed her when she made a delivery to his business, she never reported the incident to O'Reilly management. Doc. 39, Ex. 2, 15:18-17:23; 19:25-2. She also testified that when she was assistant store manager, none of the female drivers ever complained to her about Greg Henry. *Id.*, 20:3-14.

The Complaint alleges that on February 2, 2016, while Plaintiff was making a delivery to Mr. Henry's shop, he approached her from behind and grabbed her inner thigh mid-way up her right leg. Doc. 5, ¶21. Plaintiff hit him in the stomach and told him not to touch her. *Id.* The same day, after returning from Mr. Henry's shop, she reported the incident to O'Reilly Assistant Manager Mary Messer. Doc. 24, Ex. 6, ¶12. After her shift ended that day, Plaintiff texted Manager Brayden Hackler, asking him to call her as soon as possible to discuss something that

---

[2] In her deposition, Plaintiff testified that Mr. Howell "was around" when Mr. Henry told her that she was "sexy" and that "he would leave the parts there for me to bring them to him later." Doc. 34, Ex. 3, Paden Dep at 20:20-21:5. Mr. Howell, though, testified that he never witnessed any sexual harassment of Plaintiff by Mr. Henry. Doc. 39, Ex. 1, Howell Dep. at 10:17-19. He testified that after Plaintiff reported the February 2, 2016, incident, he told Mr. Henry, "Hey dude, you can't be doing that stuff." Doc. 34, Ex. 5, Howell Dep. at 8:11-21.

4

happened with Mr. Henry, and adding that "It's not something that needed to be over text message." *Id.*, Ex. 6, ¶13; Ex. 4, 35:10-36:2. According to Plaintiff, Mr. Hackler replied that he was with family and would call the next morning. *Id.*, Ex. 4 at 36:3-11.

Mr. Hackler called Plaintiff the next morning, and Plaintiff told him about Mr. Henry's conduct the previous day. *Id.*, Ex. 4 at 36:12-37:1; Ex. 7, Feb. 24, 2016 Hackler Statement. The following Monday, after O'Reilly District Manager Scott Mullins returned from a conference, Mr. Hackler called him to discuss Plaintiff's allegations. *Id.* On Monday, February 8, 2015, Mr. Mullins visited the Henryetta store and spoke with Plaintiff about her allegations. *Id.*, Ex. 4 at 38:6-19; Ex. 8, Feb. 16, 2016 Mullins Statement. Plaintiff admits that after reporting Greg Henry's alleged conduct on February 2, 2016, she experienced no further harassment from him. *Id.*

After being advised of Plaintiff's allegations, District Manager Mullins undertook an investigation into her claims, securing written statements from Plaintiff, other O'Reilly employees and Mr. Henry. *Id.*, Exs. 8, 14, 15, 18.

On February 16, 2016, and February 23, 2016, O'Reilly delivery driver Emma VanMeter submitted written statements stating that Plaintiff had refused to make deliveries to the City of Henryetta since the beginning of her employment because a man who worked there ("Derick") had made sexual advances toward her several years before she began working at O'Reilly. *Id.*, Ex. 9, Feb. 16, 2016 VanMeter Statement; Ex. 10, Feb. 23, 2106 VanMeter Statement. Ms. VanMeter also stated that Plaintiff had refused to make deliveries to another customer, Mad Image, because she alleged one of the owners had texted her sexual content, and her husband had seen it. *Id.*, Ex. 10. Ms. Vanmeter concluded, "So now there are 3 place[s] she will not deliver[:] City, Mad Image, Greg Henry." *Id.*, Ex. 9. Ms. VanMeter also wrote that "there are some guys at first street tire that have stated to me and another driver that she wants guys to get the ink p[e]n out of

5

her pocket. They call her a Sexual Harassment Lawsuit." *Id.* Additionally, she stated that Plaintiff had complained about Watson Tire and Tow, claiming that when she walked into the business, they were talking about her in some sort of sexual manner. *Id.*

On February 24, 2016, Plaintiff submitted a written statement confirming she did not want to make deliveries to the City of Henryetta or Mad Image. *Id.*, Ex. 11. She stated that she was asking not to be sent to the City of Henryetta because a maintenance employee, "Derick," had sexually harassed her in 2010, when he worked with her husband at the Dewar Fire Department. *Id.* Plaintiff stated that Mad Image owner "JR" had made disrespectful comments to her and, after seeing a picture of her on Facebook, had texted her, "Your son has the best looking lunch date in the world." *Id.* Plaintiff indicated that her husband had seen the text and asked her not to deliver to JR's shop. *Id.* She concluded, "So out of respect for my husband I prefer not to but I understand in some circumstances I may be the only driver available." *Id.*

On February 29, 2016, Plaintiff signed another written statement in which she stated that she had given her phone number to Mad Image owner JR so he could contact her husband to work out the financial details and set up a time frame to have the work done. *Id.*, Ex. 12. She also stated:

> To be honest I am ok with my position as a driver. I do understand with the shops that I do not deliver to makes it difficult for management and available staff to deliver to those places. But I'm not asking to be moved to a different Position in the store. If its what needs to be done to protect both sides its fine with me. Just know I would like more training to better understand the Job At hand. [I]f I were moved to something more detailed, I'm comfortable working counter but my knowledge is limited on diagnosing a problem with some vehicles. I am willing to learn what ever it takes [t]o make this easier on the company. Because I need this job and I didn't try to make things difficult for any one. But I felt it would be best to not let it go any longer and chance the actions of Greg to something more then it was. Something need[s] to be done so that He Knew it was not ok.

*Id.*

6

Plaintiff admits February of 2016 was the first time she went to a manager and told them she was uncomfortable making deliveries to Greg Henry. *Id.*, Ex. 4 at 43:3-7. Further, she admits that at no time after reporting Greg Henry's alleged conduct on February 2, 2016, did she experience further sexual harassment from him. *Id.* at 37:2-7.

During the course of O'Reilly's investigation into Plaintiff's allegations, none of the store's other female drivers stated they felt uncomfortable making deliveries to any of O'Reilly's customers. *Id.*, Exs. 14, 15.

In a March 1, 2016, interoffice email, Scott Edwards, O'Reilly's Central Division HR Manager, stated that as a result of O'Reilly's investigation into Plaintiff's allegations, it had been determined that Plaintiff should be laterally transferred to a driver position at store 189 in Henryetta. *Id.* Ex. 16. In the email, Edwards stated:

> The company needs to protect Ms. Paden if she is in fact being harassed. A Delivery Specialist who cannot deliver to 5 professional shops is also a hardship on store 169. If Ms. Paden refuses to transfer, we will have no other option but to accept her voluntary resignation.

*Id.*[3]

On March 7, 2016, Plaintiff met with O'Reilly District Manager, Scott Mullins, who informed her that the only way to keep her job was to transfer to another store. Doc. 24, Ex. 6, Chumeica Padden Affid., ¶17. Plaintiff asked if, instead of a transfer, O'Reilly would allow her to take "one of the three available counter positions" at the Henryetta store. *Id* That request was denied. *Id.*

---

[3] It appears that Mr. Edwards' reference to five shops is based on the three places Plaintiff had said she could not deliver to—the City of Henryetta, Mad Image and Greg Henry's business—and the two shops identified by Ms. VanMeter in her statement as being potential problems —First Street Tire and Watson Tire and Tow. See Exs. 9-10.

The same day, Plaintiff submitted another written statement in which she wrote:

> I would like to revise my first Statement in regards to the City of Henryetta. I know & understand the situation that has been stated was over a few years ago and I would like to think people have changed and knowing I have had multiple in store [e]ncounters with said individual he has not given me any further reason to believe he will pull the same stunt as before. The other shop that was stated I preferred not to go [Mad Image] really never should have been a[n] issue. It was handled and I have s[i]nce been to that shop and had no problems. I would like it to be known that if a problem later on down the road presents itself further action will be taken and the only lo[]gical action would then be to transfer to a different store. But at this time I feel tran[s]fer[r]ing to a new location is not a[n] option for me."

*Id.*, Ex. 13.

On March 7, 2016, Plaintiff resigned from O'Reilly's. *Id*, Ex. 6, Paden Affid., ¶18. Plaintiff testified the only way she would have accepted the transfer to Store 189 was if O'Reilly would have provided her additional work hours to compensate for her driving, stating, "My reason for not taking that was because if I would have taken the position in Okmulgee, I would have had to have paid for childcare on top of gas back and forth working 15 hours a week to 22 hours a week. Doc. 24, Ex. 4 at 55:11-56:1.

Mr. Mullins testified that no counter positions were available at the Henryetta store at the time Plaintiff was offered a transfer. Doc. 39, Ex. 7, Mullins Dep. at 36:4-25; 38:17-20. He also testified that he personally witnessed Plaintiff working at the counter position when she was employed by O'Reilly. *Id.*, Ex. 17, Mullins Dep., 62:20-63:24. He stated that she was "definitely uncomfortable" and "struggled" at the counter position, "[l]ooking up the wrong parts, selling wrong parts, having to pull other team members away from their customers to help." *Id.* As previously noted, Plaintiff admitted her knowledge was limited on diagnosing a problem with vehicles. *See* p. 6, *supra.* Plaintiff never submitted a request for transfer to a counter position at O'Reilly, nor did she provide material showing her qualifications to work the counter position.

On February 15, 2018, Arion Barnhart-Zellers, a Delivery Specialist with O'Reilly's Store 169, filed a complaint against Mr. Henry after he sexually assaulted her.[4] Doc. 34, Ex. 16, Barnhart-Zellers Written Statement. Following Ms. Barnhart-Zellers' complaint, only male drivers were allowed to deliver to Mr. Henry, and Ms. Barnhart-Zellers was told to leave the front part of the store if Mr. Henry visited the store. *Id.*, Ex. 8, Mary Messer Dep., 13:12-14:2.

In August and September of 2016, Plaintiff commuted for two days a week from her home in Dewar to Tulsa for work cleaning houses in Tulsa, at least 51 miles from her home. *Id.*, Ex. 5, Pl.'s Response to Interrog. No. 8.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party opposing a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

---

[4] Ms. Barnhart-Zellers stated that Mr. Henry reached into the open window of her delivery truck, rubbed her leg, then slid his hand to her vagina and started pushing, rubbing and grabbing it. Doc. 34, Ex. 16.

### III. Analysis

**A. Plaintiff's Hostile Work Environment Claim**

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citation omitted). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (citation omitted).

In cases involving harassment by co-workers, as opposed to harassment perpetrated by supervisory employees, the only available basis for employer liability is a negligence theory under Restatement (Second) of Agency § 219(2)(b). *Id.* And "[b]ecause harassment by customers is more analogous to harassment by co-workers than by supervisors," the same standard of liability applies to customer harassment. *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998) (citing *Hirschfeld v. New Mexico Corrections Dept.*, 916 F.2d 572, 577 (10th Cir. 1990)). Thus, employers may be held liable when an employee is harassed by a nonemployee "if they fail[] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Id.* The plaintiff must establish the employer had knowledge of the hostile work environment but did not adequately respond to notice of the harassment. *Turnbull v. Topeka State Hospital.*, 255 F.3d 1238, 1244-45 (10th Cir. 2001).

The negligence analysis can be divided into two separate inquiries, looking "first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the

employer's remedial and preventative responses." *Adler v. Wal-Mat Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).

### 1. Knowledge

The Tenth Circuit has stated, "[T]he question of whether [a defendant] timely acted to correct harassment turns on when it had *proper notice* of [plaintiff's] harassment complaint." *Helm v. Kansas*, 656 F.3d 1277, 1290 (10th Cir. 2011). With regard to knowledge, a plaintiff may prove actual knowledge based on her reports of harassment to management-level employees or constructive knowledge based on the pervasiveness of the sexual hostility within the working environment. *Turnbull*, 255 F.3d at 1244 (quotation omitted).

Plaintiff contends that O'Reilly had actual knowledge of harassment by Greg Henry based on statements she made to supervisors before February 2, 2016. However, although Plaintiff complained to *coworkers* that Mr. Henry was sexually harassing her, and told Mr. Hackler and Mr. Howell that the customer made "comments daily," by her own admission, February 2, 2016, was the first time she told any supervisor or manager that Mr. Henry was sexually harassing her, that she was uncomfortable delivering to Mr. Henry, or that someone else needed to take over delivery responsibilities. Vague, non-sexual references are insufficient to trigger a duty to investigate and remedy alleged sexual harassment. *See Helm*, 656 F.3d at 1290-91.[5]

Plaintiff also contends the store had actual notice about Mr. Henry's propensity for sexual harassment based on a prior complaint made by former employee Tammy Collins. But the undisputed facts establish that although Ms. Collins experienced sexual harassment by Mr. Henry,

---

[5] In *Helm*, plaintiff, an administrative assistant for a Kansas state district judge, had approached the Chief Judge and told him her judge had done something inappropriate and made her feel uncomfortable; however, she provided no details about the judge's conduct, nor did the record suggest she even mentioned sexual harassment. 656 at 1290.

she never reported it to O'Reilly management, nor—during her time as store manager—did anyone else make any complaints about the customer.

Accordingly, the Court concludes that the employer gained actual or constructive knowledge of harassment when Plaintiff complained on February 2, 2016, and that it timely investigated the complaint.

### 2. Adequacy of O'Reilly's Response

The Tenth Circuit has stated, "We have established no bright-line rule for measuring the 'appropriateness' of an employer's response, asking instead whether the response was reasonable under the circumstances." *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1245 (10th Cir 2001). "Key factors in that determination are the promptness and effectiveness of any action." *Id.* As the Tenth Circuit noted, "It is not always possible for an employer to completely eliminate offensive behavior, and thus the effectiveness inquiry looks not to whether offensive behavior actually ceased but to whether the remedial and preventative action was reasonably calculated to end the harassment." *Id.*

Plaintiff argues the transfer to the Okmulgee store was not reasonably calculated to abate Mr. Henry's harassment because she would still have to interact with Mr. Henry. Specifically, she contends that if a part Mr. Henry needed was not available at the Henryetta store, he might drive to the Okmulgee store to pick it up. Doc. 34 at 22-23 (citing Ex. 17, Paden Affid., Oct. 17, 2018).[6] However, O'Reilly was planning for Plaintiff to be a delivery driver for the Okmulgee store, and she would not have worked the counter. Therefore, the Court rejects her argument that the transfer was not reasonably calculated to abate Mr. Henry's harassment.

---

[6] In her affidavit, Plaintiff stated that when the Okmulgee store had a part he needed, but no driver was available, Mr. Henry would go pick up the part from the Okmulgee store itself. *Id.*

12

In this case, the undisputed facts establish that once Plaintiff made O'Reilly management aware of her harassment complaint, it acted promptly to investigate and respond to it. Moreover, its resolution of the complaint was reasonable under the circumstances. Plaintiff contends she should have been given a counter position instead of being transferred to another store. However, based upon the testimony of District Manager Scott Mullins—and as Plaintiff herself acknowledged in her written statement—she lacked adequate experience and/or training for the position. Furthermore, Mr. Mullins testified there were no counter positions open at the time the decision to offer her a transfer was made.

Nor is the Court persuaded by Plaintiff's argument that Plaintiff should have been treated the same as Ms. Barnhart-Zellers was two years later. At the time Plaintiff complained, no other O'Reilly employees had previously filed any complaints concerning Mr. Henry. Furthermore, Plaintiff—at the time she complained—was already refusing to deliver to at least two other customers. Ms. Barnhart-Zellers, in contrast, had no issues delivering to other customers.

There exists no genuine issue of material fact regarding whether O'Reilly took adequate steps to remedy a hostile or offensive work environment. Accordingly, O'Reilly is entitled to summary judgment a to Plaintiff's hostile work environment claim.

**B. Plaintiff's Retaliation Claim**

The prima facie elements of a Title VII retaliation claim are that: (i) plaintiff engaged in protected opposition to discrimination; (ii) a reasonable employee would have found the challenged action materially adverse; and (iii) a causal connection existed between the protected activity and the materially adverse action. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). There is no dispute that plaintiff engaged in protected opposition to discrimination, and thus, the first element is met.

With respect to the second element, "[t]he Tenth Circuit liberally defines the phrase 'adverse employment action,'" and such actions "are not simply limited to monetary losses in the form of wages or benefits." *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (citations omitted). However, courts "will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Id.* (citations omitted). An involuntary transfer that is purely lateral, in that the employee's pay, benefits, and job responsibilities remain the same, is not an adverse employment action. *Vann v. SW Bell Telephone Co.*, 179 Fed. Appx. 492, 497 (10th Cir. 2006).

Plaintiff argues the decision to transfer her to the Okmulgee store was adverse because she would not be guaranteed the same number of work hours at the Okmulgee store and her commute would have been longer. But, as previously noted, Plaintiff's payroll records show that her work hours at the Henryetta store varied, with no guarantee of hours. Moreover, the Tenth Circuit has ruled that a lateral transfer resulting in an employee's commute being extended from between five and seven minutes to between thirty and forty minutes is not an adverse employment action. *Sanchez*, 164 F.3d at 532.

Here, as in *Sanchez*, Plaintiff's job responsibilities, salary and benefits remained the same. Plaintiff's transfer, at most, caused an inconvenience that would have extended her daily commute by 9.3 miles and 10 minutes each way. Accordingly, she cannot establish that she was subject to an adverse employment action by O'Reilly. And because she was not subjected to an adverse employment action, she likewise cannot establish the third element of a prima facie case of retaliation—that a causal connection existed between the protected activity and the "materially adverse action."

Finally, in determining whether an employer's proffered nondiscriminatory reason is pretextual, "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair, or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & Cnty of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004). "Title VII is not violated by the exercise of erroneous or even illogical business judgment." *Sanchez v. Phillip Morris, Inc.*, 992 F.2d 244, 247 (10th Cir. 1993). Based on representations made by Plaintiff and Ms. VanMeter during the investigation, there were five shops Plaintiff either would not deliver to or that presented potential sexual harassment issues. The evidence supports a conclusion that O'Reilly honestly believed potential sexual harassment was an issue and acted in good faith the attempt to protect Plaintiff.

Accordingly, O'Reilly is entitled to summary judgment on Plaintiff's retaliation claim.

**C. Plaintiff's Constructive Discharge Claim**

"Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005) (abrogated on other grounds by *Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1182 (10th Cir. 2018)). "A finding of constructive discharge depends upon whether a reasonable person would view the working conditions as intolerable, not upon the subjective view of the employee-claimant." *Id.* The plaintiff's subjective view of the employment environment and the employer's subjective intent with regard to the discharge are both irrelevant. *Rennard v. Woodworker's Supply, Inc.*, 101 Fed. Appx. 296, 309 (10th Cir. 1997).

There is no evidence that any of Plaintiff's managers or supervisors were made aware of her allegations of sexual harassment before February 2, 2016. In the absence of such awareness,

it is impossible for O'Reilly to have deliberately made or allowed Plaintiff's working conditions to become so intolerable that she had to resign. Moreover, there is no dispute that here—as in *Rennard*—once Plaintiff notified management, O'Reilly took action to address her allegations, and she experienced no further harassment by Mr. Henry. Finally, by Plaintiff's own admission, transferring her to the Okmulgee store was a logical solution, even if it was not one she preferred. Based on the facts before it, the Court concludes that no reasonable jury could find Plaintiff had "no other choice but to quit." *Mackenzie, supra.*

Accordingly, O'Reilly is entitled to summary judgment on Plaintiff's constructive discharge claim.

## IV. Conclusion

For the reasons set forth above, Defendant O'Reilly Automotive Stores, Inc.'s Motion for Summary Judgment (Doc. 24) is granted.

**ENTERED this 19th day of February, 2019.**

_____
**TERENCE C. KERN**
**United States District Judge**